Franklin SALLEY

v.

Dana CHILDS.

Supreme Judicial Court of Maine.

Argued March 15, 1988.
Decided June 2, 1988.

Peter B. Bickerman (orally), Sumner H. Lipman, Lipman & Katz, Augusta, for plaintiff.

Stephen C. Whiting (orally), Hewes, Douglas, Whiting & Quinn, Portland, for defendant.

Before McKUSICK, C.J., and
NICHOLS,* WATHEN, GLASSMAN,
SCOLNIK and CLIFFORD, JJ.

CLIFFORD, Justice.

The plaintiff, Franklin Salley, appeals from a judgment of the Superior Court, Androscoggin County, awarding him damages of $5,500, plus interest and costs, for the pecuniary loss caused by the legal malpractice of defendant Dana Childs, a practicing attorney. We agree with Salley's contention that the Superior Court erred in concluding as a matter of law that Salley was not entitled to additional damages for the emotional distress and reputational injury he allegedly suffered. Accordingly, we vacate the judgment and remand for a new trial.

This legal malpractice action arose out of a complaint brought by the Maine State Harness Racing Commission ("the Commission") alleging that Salley, a licensed horse trainer, had violated Commission rules in his handling of "Filter Blue," a horse that tested positive for nicotine in a "winning horse urine test" on January 10, 1981, at Scarborough Downs. The complaint sought revocation of Salley's 1981 trainer-driver license and an order forbidding the Commission from renewing it. The complaint also named as a defendant Robert K. Berry, the licensed owner of Filter Blue, and sought the forfeiture of his owner's license and the $262.50 purse that Filter Blue's victory earned him.

Salley and Berry each received a copy of the complaint in the spring of 1981. At

* Nichols, J., sat at oral argument and participated in the initial conference but retired before this opinion was adopted.

Berry's request, Attorney Childs agreed to represent Berry and Salley in the matter.

Salley, who owned several horses at the time, had served as the trainer to Berry's horses since the mid–1970's and considered training his livelihood. Because he did not believe in cold weather racing, Salley advised against entering Filter Blue at Scarborough Downs' 1981 winter meet, and did not participate in the meet. He was not at the racetrack on January 10, 1981, the day of Filter Blue's victory and positive urine test, and did not, in fact, possess a then current trainer's license.

Childs was not aware of this potential defense until well after Salley had been adjudicated liable as Filter Blue's trainer, having concluded from the racing program and Filter Blue's eligibility papers that Salley was the horse's trainer on January 10, 1981. From the spring of 1981 when he undertook to represent Berry and Salley on the horse-drugging charges until after the hearing on the complaint before the Administrative Court in March 1982, Childs did not once communicate or attempt to communicate with Salley directly. Childs communicated only with Berry, who did not inform him of Salley's noninvolvement with Filter Blue, and assumed that Berry was passing information along to Salley.

Childs, a horse owner and trainer himself, had previously represented many horsemen in Commission matters. He understood the Commission rules to impose upon a trainer something approaching absolute liability for the condition of a horse at race time.

At the hearing before the Administrative Court Childs stipulated that Salley was Filter Blue's trainer at the relevant time and further stipulated that a witness was prepared to testify that Salley had told him that he had given the horse nicotine within three days before the January 10, 1981 race. Childs had not informed either of his clients of the date of the March 1982 hearing, having previously told Berry that the defendants' attendance was unnecessary because their liability under Commission

rules was virtually undeniable. Childs later informed Berry that the hearing had already occurred.

In April 1982 the Administrative Court issued its decision, ordering that Salley's trainer's license be suspended for 120 days and that Berry forfeit his winning purse. Salley was upset upon learning that he had been adjudged guilty without first having received any communication from his lawyer or information about the proceeding, and became further upset in May 1982, when Childs contacted him for the first time and told him of the 120–day license suspension. Salley visited Childs' office shortly thereafter at Childs' invitation, but walked out of the meeting after voicing his displeasure with his attorney's handling of the case. During this brief encounter, Salley did not offer the information that he was not Filter Blue's trainer at the time of the January 10, 1981 race nor did Childs inquire into the merits of any possible defense. Childs did, however, encourage his client to attend a hearing on a motion for reconsideration of the 120–day suspension filed by Childs and to be heard later that day. Salley refused to attend, having concluded that "the damage had already been done."

After the hearing on the motion for reconsideration, the Administrative Court reduced Salley's license suspension from 120 to 30 days. At about this time Salley retained another attorney to assist him with the Commission matter. Salley's new counsel eventually prevailed upon the Administrative Court to reverse its original decision, and to enter judgment in favor of Salley and against the Commission.

Throughout the pendency of these proceedings, Salley was authorized to train horses by the Commission.[1] If his trainer's license was ever effectively suspended, it was only for a period of a few days. He continued to train Berry's horses for several months after learning of his license suspension before leaving Berry's employ voluntarily in 1982. Salley kept and trained several of his own horses until sometime in

1. In 1982 the Commission told Salley he could train under his 1981 license. In March and

May of 1982, Salley obtained stays of his license suspension.

1982 or 1983, when he gave them to his nephew.

Although he had loved training horses for many years and had never before given much thought to retiring, there was evidence that Salley began losing interest in horses when he learned of his license suspension, and that he rarely went to the racetrack because of the shame he felt as a result of the adverse publicity attending his license suspension. Notice of his suspension was published on the bulletin board at Lewiston Raceway, in the racing program, and in national harness racing publications. Salley's evidence showed him becoming generally despondent, poorly motivated, and far less sociable than he had previously been.

Salley filed a complaint in the Superior Court, alleging that Childs "was negligent and guilty of malpractice [in] failing to meet with the Plaintiff to discuss his case, and failing to notify the Plaintiff of the hearing date." The complaint further alleged that this negligence caused Salley to lose his trainer's license and his right to earn a living and caused injury to his reputation.

At the close of evidence in the jury trial the trial justice limited Salley's recovery to out-of-pocket expenses and loss of income. Because Salley suffered no physical consequences and because the trial justice was convinced that there was no underlying tort committed within the meaning of *Rubin v. Matthews Int'l Corp.*, 503 A.2d 694 (Me.1986), recovery for emotional damages and reputational injury was precluded.

The jury returned a verdict for Salley and awarded him $65,000 in damages. The trial justice concluded that the jury had awarded damages for emotional and reputational injury despite his instructions, and pursuant to M.R.Civ.P. 59(a), granted Childs' motion for a new trial, limited to the issue of damages, unless Salley remitted all sums in excess of $5,500. Salley refused to remit and the case was tried anew, without a jury, before a different Superior Court justice. The parties agreed the court could determine the damages based on the evidence adduced at the first trial. On that basis the trial justice concluded that Salley's damages were $5,500 for out-of-pocket expenses, loss of income and loss of earning capacity. From this judgment Salley has appealed.

■ In *Rubin* we precluded recovery for negligent infliction of emotional distress when the *sole* harm suffered is emotional distress. *Rubin*, 503 A.2d at 698–99. *See Packard v. Central Maine Power Co.*, 477 A.2d 264, 268 (Me.1984).[2] Here Salley presented evidence of legal malpractice,[3] a tort, and demonstrated a pecuniary loss proximately caused by that tort. Although he did not allege nor prove any physical injury, under *Rubin* he is entitled to recover, in addition to his pecuniary losses, all other damages, including emotional distress damages, proximately caused by the malpractice. On the record before us, we cannot say as a matter of law that a fact-finder could not conclude that Salley suffered severe emotional distress[4] and that Childs could not have reasonably foreseen that legal malpractice involving Salley's profession as a horse trainer, resulting in an adverse judgment and adverse publicity,

2. Since the time of Salley's appeal, we have clarified the law to allow recovery for negligent infliction of severe emotional distress when emotional distress damages are the only damages alleged. *Gammon v. Osteopathic Hosp. of Maine, Inc.*, 534 A.2d 1282, 1285 (Me.1987). Because Salley was entitled to recover under pre-*Gammon* law, we need not decide the retroactive applicability of *Gammon*.

3. The evidence of Childs conceding liability on behalf of Salley without first consulting his client or otherwise apprising himself of the salient facts of the case supports a conclusion that

Childs' conduct constituted legal malpractice, a tort sounding in negligence.

4. Damages for emotional distress are recoverable if the emotional distress is "severe," i.e., if "a reasonable person, normally constituted, would be unable to adequately cope with the mental stress engendered by the circumstances of the event." *Rowe v. Bennett*, 514 A.2d 802, 805 (Me.1986). The reasonable person is the ordinarily sensitive person and not the supersensitive, "eggshell psyche" plaintiff. *Gammon*, 534 A.2d at 1285.

would cause such severe emotional distress. *See Rowe v. Bennett,* 514 A.2d 802 (Me.1986); *Culbert v. Sampson's Supermarket, Inc.,* 444 A.2d 433 (Me.1982).

We agree with Salley's final contention that the trial justice erred by precluding his recovery for reputational injury. To the extent that Salley proves any actual injury to his reputation proximately caused by the negligence of Childs, it may be considered by the factfinder in assessing damages for pecuniary loss or emotional distress, and it was error to exclude it entirely from consideration.

Even though Childs has previously been found to have been negligent and Salley's pecuniary damages have been determined, a new trial on all issues of liability as well as damages is necessary since proximate causation of any severe emotional injury to Salley has not been litigated and the evidence on pecuniary and emotional distress damages is interrelated and overlapping.

The entry is:

Judgment vacated.

Remanded to the Superior Court for further proceedings consistent with the opinion herein.

All concurring.